**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION AT LAFAYETTE**

| | | |
|---|---|---|
| **BRANDON ROBERTS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO: 4:19-cv-28** |
| | ) | |
| **BOARD OF TRUSTEES OF PURDUE UNIVERSITY** | ) | |
| | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

1. Brandon Roberts ("Roberts"), by his attorney John Haskin and Associates, for his Complaint against Defendant respectfully alleges as follows:

## THE NATURE OF THIS ACTION

2. This constitutional due process, Title IX reverse discrimination, Title XI racial discrimination and related state law suit is brought on behalf of Plaintiff Brandon Roberts, who was expelled from Purdue University on March 20, 2017. Prior to the events that are the subject of this Complaint, Roberts was a successful student with an unblemished disciplinary record that additionally was on scholarship and playing for Purdue's football team. Roberts' dreams and desire to one day play professional football were dealt a serious blow when false accusations of sexual assault were leveled against him in October of 2016.

3. The false accusations of sexual assault were upheld by the Defendant following a biased and one sided investigation that can only be described as a complete failure of justice. This totally inadequate and discriminatory investigative process was spurred on by the Federal

Governments dictate to universities all but ordering a Title IX complaint process that ensured any accused would be found guilty of the allegations against them.

4. Plaintiff alleges that due to gender and racial bias, the already fundamentally flawed investigation process was irrevocably biased against him. The outcome was preordained. A white female student accused a black athlete of sexual assault. Despite no supporting evidence that Roberts had actually committed sexual assault, Purdue condemned and expelled him, causing serious financial and personal injury.

**THE PARTIES**

5. Plaintiff Brandon Roberts is an African-American natural person residing in the State of Georgia. During the events described herein, Roberts was a student at Purdue University and was on scholarship with the football team.

6. Defendant Purdue University (" Purdue") is a land grant university established by the State of Indiana and is located on a main campus in West Lafayette, Indiana and on three regional campuses in Indiana. Defendant Purdue has 13 colleges and schools, including the College of Engineering, the College of Liberal Arts, the College of Sciences and the Krannert School of Management. Defendant Purdue is audited by State of Indiana auditors, the beneficiary of state authorized bonds and the recipient of state and federal grants.

7. Defendant Purdue University Board of Trustees ("Defendant Purdue Board of Trustees") has ten members, and they as a Board have the responsibility for making rules and regulations to govern the University. The selection of these Trustees is prescribed in Indiana Code IC 21-23-3. Three of the Trustees are selected by the Purdue Alumni Association. The remaining seven Trustees are selected by the Governor of the State of Indiana.

**JURISDICTION AND VENUE**

8. This Court has federal and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343 and 28 U.S.C. § 1367 because: (I) the case arises under the laws of the United States; (ii) the claims brought under Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681 et seq., and 42 U.S.C. § 1983 are civil rights claims;

9. This Court has personal jurisdiction over Defendants on the grounds that Defendants are conducting business at Defendant Purdue within the State of Indiana.

10. Venue for this action properly lies in this district pursuant to 28 U.S.C. §1391 because the events or omissions giving rise to the claim occurred in this judicial district.

**RELEVANT FACTUAL BACKGROUND**

11. Following the Department of Educations ("DOE") "Dear Colleague" letter, colleges and universities, including Defendant Purdue, were fearful of and concerned about being investigated or sanctioned by the DOE and/or of potential Title IX lawsuits by the U.S. Department of Justice ("DOJ"). The White House, in 2014, specifically threatened to withhold federal student aid funding, followed by then Vice President Biden stating that he would like to "take away federal funding" from schools that did not initiate the one sided standards advocated for by the federal government. "*Obama, Biden Won't Visit Universities That Fall Short In Addressing Sexual Assault*," Huffington Post, July 4, 2016

12. The threat of revoked federal funding represented a mortal threat to Purdue and other universities as they are highly dependent on federally backed student loans for revenue. This pressure in turn forced Universities to implement Title IX procedures such as those that the

plaintiff was exposed to, wherein the purpose of the investigation is not to find the truth, but rather to find the accused guilty by limiting procedural protections for male students.

**SPECIFIC FACTUAL ALLEGATIONS**

13. Roberts accepted an athletic scholarship offer from Purdue University and enrolled for classes at Purdue beginning in the Fall of 2016.

14. From the beginning of his time on Campus up to the events of October 13, 2016, Roberts performed well in classes and was not the subject of any formal or informal discipline.

**The Events of October 13-14, 2016**

15. On Thursday, October 13, 2016 Roberts joined two (2) associates at an off campus house to "hang out" and watch television. Roberts knew all three individuals through the football team. As such, while he considered all three friends, he knew little of them and had only had contact with the individuals for approximately two (2) months.

16. Roberts and his associates were later joined by three female individuals: Sara Zaloudek, Emma Tisserand and Allison Bowman, ostensibly to "hang out." Zaloudek, Tisserand and Bowman were friends with Roberts' associate. Roberts did not personally know any of the three female individuals. Zaloudek, Tisserand and Bowman are all Caucasian/white.

17. While watching television, the six (6) individuals present entered into conversation regarding their plans for the evening. Zaloudek, Tisserand and Bowman all stated that they were interested in drinking alcohol that evening.

18. Zaloudek and Tisserand then informed the gathering that they were interested in having sexual intercourse with one or more of the male individuals present. Specifically, Zaloudek and Tisserand stated that they were interested in having a "threesome" or sexual intercourse with multiple partners.

19. Zaloudek and Tesserand were extremely forward with their comments regarding sexual intercourse. They openly stated they wanted to have intercourse with the individual males present.

20. The three (3) female individuals then left the house to attend a party at another location. The three (3) male individuals did not accompany them to this party.

21. Roberts and his associates remained at the same off campus house and continued to converse and watch television.

22. Meanwhile, Zaloudek, Tesserand and Bowman attended a large gathering wherein alcohol was readily available. Zaloudek, Tesserand and Bowman all were under 21 years of age. Zaloudek and Tesserand later stated that they consumed wine and liqueur at the gathering.

23. While at the gathering, Zaloudek and Tesserand both sent text messages to Roberts' associates stating they wanted to have sexual intercourse with them. The text messages specifically stated that the two females were interested in having a "threesome." Zaloudek specifically requested permission to return to the off campus house to engage in sexual activity with multiple partners.

24. Before returning to the house, Zaloudek was seen by a third party making sexual advances on a separate third party.

25. Zaloudek, Tesserand and Bowman then returned to the off campus house. Roberts and his two associates were still present, having been watching television for the duration of Zaloudek, Tesserand and Bowman's absence.

26. Bowman then left the house. Shortly after returning, Zaloudek sat on Roberts' associate's lap and stated that she wanted to have a threesome. Zaloudek made this statement in front of Roberts, his associates and Tesserand. All later stated that Zaloudek made this statement

and Zaloudek did not deny making the statement.

27. Zaloudek, Tesserand and one of Roberts' associates then entered a separate bedroom while Roberts and his other associate remained in the main room, continuing to watch television.

28. After some time passed, Robert's associate reentered the main room and stated that Zaloudek had requested Roberts have sexual intercourse with her. Roberts then entered the bedroom following his associate.

29. Upon entering the bedroom Roberts found Zaloudek and Tesserand sitting on the bed. Zaloudek immediately approached Roberts and said "come here." She then pulled down Roberts' shorts and underwear and began performing oral sex on Roberts.

30. While Zaloudek performed oral sex on Roberts, Tesserand and Roberts' associate began initiating sexual contact while positioned on the same bed. Both Tesserand and Zaloudek commented that they were enjoying themselves and that "this is the best thing we've ever done."

31. After an indeterminate amount of time passed with Zaloudek performing oral sex on Roberts, Roberts ejaculated in her mouth. Immediately following this, Zaloudek took off her pants and underwear and stated to Roberts "fuck me."

32. Roberts had become uneasy and did not wish to further engage in any sexual contact with either Zaloudek or Tesserand. Roberts exited the bathroom and entered the restroom to clean himself.

33. While in the restroom, both Zaloudek and Tesserand had consensual sexual intercourse with Roberts' associate.

34. Roberts then returned to the main room and continued watching television. Zaloudek, Tesserand and Roberts' associates remained in the bedroom for an indeterminate amount of time.

35. While watching television, Roberts' two other associates entered the bedroom and

engaged in some form of sexual intercourse with either/both Zaloudek and Tesserand. Roberts did not reenter the bedroom.

36. Eventually, all parties present, including Zaloudek and Tesserand returned to the main room, watched television and engaged in conversation concerning, among other things, the events of that evening.

37. Both Zaloudek and Tesserand then stated that having group sex was a “sorority goal” that they had just achieved. They also again referred to the group sex as “the best thing we have ever done.”

38. Neither Zaloudek nor Tesserand expressed any qualms or concerns regarding the group sex that had occurred. The gathering was described by multiple witnesses as “normal.” Zaloudek nor Tesserand were reported showing any signs of unease or anxiety regarding what had happened.

39. Zaloudek and Tesserand later left the house on cordial terms.

**Factual Allegations Regarding the Allegations and Investigations**

40. The next day, October 14, 2016, Zaloudek and Tesserand contacted the West Lafayette Police Department and reported that they had been victims of sexual assault.

41. Both Zaloudek and Tesserand gave interviews to Detective Jeffrey Dunscomb.

42. Zaloudek, in her interview, stated that she was not intoxicated and was capable of consenting to sexual intercourse on the night of October 13, 2016. She further stated that she had consented to sexual intercourse with the male individuals at the off campus house. Zaloudek further claimed, however, that she had not consented to all of the sexual contact. Exactly which sexual contact she claimed she consented to and which she did not consent to is left unclear. Tesserand gave similar testimony.

43. Zaloudek confirmed that she had stated she wanted to have group sex, that she had asked to return to the house to engage in group sex and that she voluntarily engaged in group sex.

44. Later on October 14, Detective Dunscomb contacted Roberts to take a statement regarding the allegations. Roberts explained to Dunscomb the events of the night of October 13, including that Zaloudek had initiated oral sex on Roberts.

45. Detective Dunscomb then informed Roberts that Zaloudek and Tesserand had confirmed the same facts and as such all sexual interaction was consensual. He also informed Roberts that he had "nothing to worry about."

46. Detective Dunscomb provided the findings of his investigation to the Tippecanoe County Prosecutors office. The Prosecutors office then declined to press charges against Roberts or any of the other individual present.

47. On October 18, 2016 Roberts received a letter dated that day from Katherine L. Semersheim, Dean of Students at Purdue, notifying Roberts that Defendant has been made aware of allegations, including sexual allegations, regarding Roberts' conduct toward Zaloudek that, if substantiated, might constitute a violation or violations of Defendant's Anti-Harassment Policy (IlL Ch. 1). This letter also stated the allegations against Roberts included "sexual violence." The letter also indicated that Roberts would be suspended immediately from the university.

48. On October 21, 2016, Roberts responded to Semersheim in writing and unequivocally denied the allegations against him. By separate correspondence on the same day, Roberts requested an appeal of his immediate suspension from the University.

49. On October 24, 2016, Semersheim emailed Roberts and confirmed receipt of the appeal of his suspension. Semersheim asked to meet with Roberts to "review [his] appeal

further." Roberts was also told that he could "bring a support person with you, but this person's role is not to speak for you."

50. On October 26, 2016, Roberts and Semersheim met in person. Robert's explained the events of October 13 and 14 and assured Semersheim he was not a threat to other students. After this meeting, Semersheim issued a letter that lifted the suspension.

51. On November 4, 2016, Roberts attended an investigatory meeting with University investigators Amberger and Givens. On information and belief, Amberger and Givens had no relevant experience in investigating allegations of this nature nor had they received adequate training on the due process rights of the accused. Roberts was again told that he could bring a "support person" but that the support person was not entitled to speak on Roberts' behalf. Roberts was not permitted to produce any evidence at this hearing other than his own verbal testimony.

52. Roberts explained the events of October 13 and 14 to the investigators. He was then told that investigation into the matter was still proceeding and that the University was required by its own policies to issue a final investigative report within two weeks.

53. On November 16, 2016, Semersheim issued correspondence to Roberts stating that she had unilaterally decided to grant an extension of time to the investigators to compile their report. Roberts was not asked beforehand if he objected to this extension. The extension was to November 30, 2016.

54. No report was forthcoming on November 30, 2016. Instead, Roberts was left in limbo not knowing why the delay had occurred, why extensions were being granted, or how the investigation was proceeding.

55. On January 16, 2017, Semersheim issued correspondence to Roberts that stated the

investigators would issue a final report on or before January 24, 2017. Again, no explanation was given for the delay and Roberts was not informed of any other details regarding the investigation.

56. Still completely in the dark regarding the status of the investigation and the complete nature of the allegations against him, Roberts received additional correspondence from Semersheim on February 2, 2017. In this correspondence, Roberts was informed that Semersheim would be convening an "Advisory Committee on Equity" regarding the complaint against him. Roberts was notified that he could attend the hearing.

57. Roberts informed Semersheim that he did wish to attend the hearing. Semersheim responded in writing on February 8, 2017 and stated that hearing would be held on February 15, 2017. Roberts was again informed that he could bring a "support person" but the letter specifically forbade that person to act as "legal counsel." Additionally the letter stated specifically that Roberts would not be allowed to present any evidence at this hearing.

58. On February 28, 2017, Semersheim issued correspondence to Roberts that indicated she had found the allegations against Roberts substantiated. In the letter, Semersheim specifically states that she found the accuser "more credible" than Roberts. No information was provided as to why Roberts was found less credible. Roberts was never given an opportunity to present evidence that may have undermined the accusers credibility. The letter also stated that Roberts was expelled from the University immediately and barred from campus. Finally, the letter stated that Roberts had until March 10, 2017 (a total of 10 days) to file an appeal of this decision.

59. The University's policies and procedures dictate the appeal process. Roberts only avenue of appeal was to submit a written appeal to Alyssa Rollock within 10 days. The appeal must be limited to evidence provided in the investigative report; new evidence may not be submitted.

60. While Roberts was provided a heavily redacted copy of the investigative report, the level of redaction was so extreme as to render the document nearly illegible. Additionally, while Roberts was allowed to review the report, which summarized the investigators' subjective findings, he was not permitted to review transcripts of interviews or other direct evidence that informed the report. The entire appeal was limited only to the report itself and to Semersheim's February 28 letter.

61. Roberts submitted a written appeal on March 9, 2019 alleging that the evidence in the report did not support the committee's findings, that his expulsion was grossly disproportionate to the allegations against him, and that the University had failed to follow its own policies and procedures, noting that the Final Determination letter was required to be issued 10 days after the committee hearing, but was in fact issued 13 days after the hearing.

62. On March 20, 2019, Rollock issued correspondence to Roberts that denied his appeal. Specifically, Rollock found that the numerous delays in the investigative process did not prejudice Roberts. The response also mentioned specific evidence, recordings of police interviews, that the university had never made available to Roberts.

63. Roberts was therefore expelled from the university, removed from the Purdue football team and had his athletic scholarship revoked. In order for Roberts to be able to join another football program, he would have to be released by Purdue University. Purdue has since declined to do so, despite multiple opportunities and requests.

64. On march 23, 2017, Roberts' mother Mary Sermons sent a letter to University President Mitch Daniels seeking further review of Roberts' case. No response to this letter was ever received.

65. Throughout the investigative process, Purdue violated its own policies and procedures

to ensure a finding for the accuser, regardless of the evidence. On information and belief, Purdue did so because Roberts is black and male.

66. The final determination was issued by Semersheim, despite a lack of corroborating evidence, because Roberts is black and male.

67. Rollock denied Roberts' appeal because he is black and male.

68. Moreover, Purdue's Policy contain several policies and/or procedures that denied Farrer and other similarly situated male students their Title IX rights. For instance, the procedures do not allow for representation of the accused, does not require the production of evidence used against the accused and gives the accused inadequate time to prepare responsive filings, while allowing for endless investigatory extensions. Upon information and belief, Defendants' decision to engage in these practices was motivated – in part - by the anti-male gender bias detailed in this Complaint.

69. Roberts has suffered, and continues to suffer, substantial damages as a result of Defendant's conduct.

**COUNT I**

**VIOLATIONS OF TITLE IX**

70. Roberts incorporates by reference all allegations contained in paragraphs 1-69 of this complaint.

71. Pursuant to 20 U.S.C. § 1681, Title IX is a federal statute designed to prevent sexual discrimination and/or harassment in educational institutions receiving federal funding

72. Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688, applies to all public and private educational institutions that receive federal funds, including colleges and

universities. The statute prohibits discrimination based on sex in a school's "education program or activity," which includes all of the school's operations. Title IX provides in pertinent part: "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The United States Supreme Court has held that Title IX authorizes private suits for damages in certain circumstances."

73. Purdue receives federal financial aid and is thus subject to these provisions.

74. Title IX includes an implied private right of action, without any requirement that administrative remedies, if any, be exhausted. An aggrieved plaintiff may seek money damages and other relief

75. Title IX mandates Purdue afford equitable procedures and due process to Roberts which includes, but is not limited to: (a) providing adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence, and/or (b) that Purdue employees involved in the conduct of the procedures have adequate training.

76. Upon information and belief, Purdue knew, or in the exercise of due care should have known, employees including, but not limited to, Individual Defendants received gender biased training regarding Title IX which caused them to violate Roberts' Title IX rights in part by equating "complainants" in sexual misconduct proceedings as being females who must receive preferential treatment.

77. Purdue's policies fail to meet the standards required by Title IX and/or Constitutional safeguards as interpreted by United States' courts regarding how institutions of higher education conduct disciplinary proceedings.

78. Upon information and belief, in virtually all cases of campus sexual misconduct by

Purdue students, the accused student is male and the accusing student is female.

79. Defendants' investigation and/or discipline of Roberts is discriminatory and based upon or motivated by Robert's male gender.

80. The male gender discrimination by Defendants against Roberts includes, but is not limited to, providing preferential treatment to the accuser. This preferential treatment includes, but is not limited to allowing her, but not Roberts, the opportunity to review and respond to witness statements, present credibility witnesses, and attend and make a statement at the disciplinary hearing without having to respond to any questions.

81. Purdue employees, including but not limited to Individual Defendants, exhibited deliberate indifference by refusing to remedy: (a) Purdue's violations of Roberts' rights under Purdue Policies, Title IX, and/or the Constitutions of the United States.

82. Defendant's deliberate indifference caused Roberts to suffer sexual harassment and/or discrimination so severe, pervasive or objectively offensive that it deprived Roberts of access to educational opportunities or benefits (and) caused other harms detailed above.

83. Defendant's actions and deliberate indifference caused Roberts to suffer, and continue to suffer, damages.

**COUNT II**

**VIOLATIONS OF TITLE VI**

84. Roberts incorporates by reference all allegations mentioned in paragraphs 1-83 of this complaint.

85. Title VI of the Civil Rights Act of 1964 states "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal

financial assistance."

86. Purdue receives federal funding and is therefore subject to Title VI.

87. Title VI includes an implied private right of action, without any requirement that administrative remedies, if any, be exhausted. An aggrieved plaintiff may seek money damages and other relief.

88. Defendant's actions detailed in this complaint excluded Roberts from participation in and denied him the benefits of an education at Purdue as well as further participation in athletics and athletic financial aid.

89. On information and belief, Defendant's actions were motivated, in part, by Roberts' race including, but not limited to Defendants favoring the credibility of the white accuser despite no corroborating evidence over Roberts' testimony.

90. Defendant's deliberate indifference caused Roberts to suffer racial harassment and/or discrimination so severe, pervasive or objectively offensive that it deprived Roberts of access to educational opportunities or benefits (and) caused other harms detailed above.

91. Defendant's actions and deliberate indifference caused Roberts to suffer, and continue to suffer, damages.

**REQUESTED RELIEF**

WHEREFORE Plaintiff, Brandon Roberts, respectfully requests that this Court enter judgment in his favor as follows:

1. Find and hold that Roberts has suffered damages as a result of Defendants' unlawful conduct in violation of Title IX and Title VI.

2. Order Defendants to pay Roberts reinstate Roberts or pay him damages in lieu of.

3. Order Defendants to comply with requested injunctive relief.

4. Order Defendants to pay compensatory damages related to his loss of opportunity and income and emotional distress.

5. Order Defendants to pay punitive damages to Roberts due to its reckless disregard and indifference to Roberts' rights as protected by Title IX and Title VI.

6. Order Defendant to pay Roberts pre- and post-judgment interest on all sums recoverable, and;

7. Award all other relief that is just and proper.

Respectfully submitted,

*s/ John H. Haskin*
John H. Haskin, Attorney No. 7576-49

*s/ Keenan D. Wilson*
Keenan D. Wilson, Attorney No. 32195-49

Attorneys for Plaintiff
Brandon Roberts

JOHN H. HASKIN & ASSOCIATES
255 North Alabama Street, 2nd Floor
Indianapolis, Indiana 46204
Telephone: (317)955-9500
Facsimile: (317)955-2570
Email: jhaskin@jhaskinlaw.com
kwilson@jhaskinlaw.com

**DEMAND FOR JURY TRIAL**

Plaintiff, Brandon Roberts, by counsel, respectfully requests a jury trial for all issues deemed triable.

Respectfully submitted,

*s/ John H. Haskin*
John H. Haskin, Attorney No. 7576-49